UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

DAVID MICHAEL JONES,            )
                                )
            Plaintiff,          )
    vs.                         )   No: 1:06-cv-162-SEB-JMS
                                )
SHERIFF TERRY RICHWINE, et al., )
                                )
            Defendants.         )

**Entry Discussing Motion for Summary Judgment**

For the reasons explained in this Entry, the motion for summary judgment filed by the defendants on January 30, 2007, and supplemented on March 23, 2007, must be **granted.**

**I. Background**

The plaintiff in this civil rights action is David Michael Jones ("Jones"), who was formerly confined at the Madison County Detention Center ("Jail"). He filed this action on April 4, 2006. Several defendants were dismissed from the action through the screening Entry on April 26, 2006. The remaining defendants are Sheriff Terry Richwine ("Richwine") and Jail Commander Andy Williams ("Williams"). Jones alleges that the defendants violated several of his constitutionally protected rights. He seeks compensatory and punitive damages and injunctive relief.[1]  The defendants seek resolution of Jones' claims through the entry of summary judgment.  Jones has opposed that motion.

---

1The plaintiff is no longer confined at the Jail. Therefore, any claim for injunctive relief is **dismissed** as moot. *Higgason v. Farley,* 83 F.3d 807, 811 (7th Cir. 1996). A court lacks jurisdiction to adjudicate a claim that is moot. *Board of Educ. of Downers Grove Grade School Dist. No. 58 v. Steven L.,* 89 F.3d 464, 467 (7th Cir. 1996), *cert. denied,* 520 U.S. 1198 (1997).

"Summary judgment is appropriate where the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Westra v. Credit Control of Pinellas,* 409 F.3d 825, 827 (7th Cir. 2005) (quoting Rule 56(c) of the *Federal Rules of Civil Procedure*). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine only if a reasonable jury could find for the non-moving party. *Id.* "'It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.'" *Sanders v. Village of Dixmoor,* 178 F.3d 869, 870 (7th Cir. 1999) (quoting *Liberles v. County of Cook,* 709 F.2d 1122, 1126 (7th Cir. 1983)).

## II.  Undisputed Facts

On the basis of the pleadings and the expanded record, and specifically on the portions of that record which comply with the requirements of Rule 56(e), the following facts are undisputed for purposes of the motion for summary judgment:

Jones was booked into the Jail on August 17, 2005, on charges of battery and violating his parole. Jones was transferred to the Correctional Industrial Facility ("CIF") on January 20, 2006, based upon an active warrant to retake offender issued by the Indiana Department of Correction. Jones was transferred back to the Jail on April 7, 2006. Jones was transferred to the Reception and Diagnostic Center of the Indiana Department of Correction on June 9, 2006, as a safekeeper.

Inmates receive a primary classification review upon book-in to the Jail. Jones' point total resulted in his classification status being defined as maximum. Maximum security inmates are subject to a classification review every fifteen days. Throughout his stay at the Jail, Jones was classified as maximum security level.

The classification system is designed to promote good behavior and to enable the inmate to lower his or her classification level through good behavior to regain privileges suspended for major or minor rule violations. The classification system provides for management and confinement needs of the Jail, protection and safety of the inmates, to prevent escape, and to protect the general public.

Maximum security inmates are not permitted to attend group religious services or participate in educational or vocational programs at the Jail. Maximum security inmates may request individual ministry with a chaplain by submitting an inmate request form. Jones met with a minister eight or nine times while at the Jail.  Maximum security inmates are not permitted to attend GED courses. The GED courses are attended by only minimum security inmates. The courses are conducted by civilian volunteers.

Maximum security inmates are not permitted to go to outdoor recreation. Maximum security inmates are allowed access to a dayroom which provides space for out of cell exercise and calisthenics. Jones received an isometric exercise plan while at the Jail and he did daily exercises in his cell and in the dayroom, sometimes using a mop bucket with which to work out. Maximum security inmates are restricted from participating in activities such as recreation, GED, and group religious services to protect institutional safety and security and the safety and security of other inmates.

Maximum security inmates can participate in all programs offered by the Jail by adjusting their behavior to the rules and regulations of the Jail. The jail classification system rewards good behavior with a lower point total. If the inmate does not commit a major rule violation for 90 days he or she can possibly receive a lower classification level on a subsequent review.

Jones was familiar with the grievance procedure of the Jail. The grievance procedure specifically provides that any inmate can file a grievance concerning treatment of conditions of confinement with the Sheriff or his designee. The Sheriff or his designee will conduct an investigation and respond to the inmate no later than seven days after the grievance is received. The grievance procedure also provides that if the inmate is not satisfied with the resolution of the grievance the grievance can be submitted to the jail commander.  There is no indication that Jones filed any grievance concerning denial of access to GED courses.

During the period of Jones' incarceration, Dr. Green was the jail physician. Nurse practitioner Shelly Sparks provided medical care to Jones while he was housed at the Jail under the supervision of jail physician Dr. Scott Green.

Sparks examined Jones on December 20, 2005. Jones reported a bulge in his left groin area (hernia) and that he had hepatitis C. He also complained of headaches and back pain. Sparks discussed Jones' medical concerns at length and informed him that he had an appointment with a gastroenterologist for treatment and evaluation of his hepatitis C and hemorrhoids which were discovered during the examination. The hernia was small and reducible and did not require any further treatment at that time.

Jones was evaluated by Dr. Nisi of Central Indiana Gastroenterology on December 30, 2005. Dr. Nisi ordered a colonoscopy and blood tests to develop a treatment plan for the hepatitis C. Jones' blood was drawn on January 3, 2006, and preliminary results were received on January 9, 2006. On January 12, 2006, Dr. Nisi ordered that Jones begin weekly interferon and daily ribavirin therapy for a period of six months. On January 20, 2006, Jones was transferred to the CIF due to a parole detainer. A copy of Jones's medical packet accompanied him to the CIF.

On April 7, 2006, Jones returned to the Jail. Dr. Nisi's treatment plan was not followed while Jones was housed at the CIF. On May 5, 2006, Jones saw Dr. Nisi for a second examination so that treatment for his hepatitis C could resume. The May 5

appointment was the first available appointment after Jones' return to the Jail. Dr. Nisi ordered that the weekly interferon and daily ribavirin therapy resume after the required blood work was completed.

After several inquiries, Sparks received Jones's lab results by fax on May 12, 2006. Sparks had verbal instructions for medication and treatment but had not been provided dosages for the interferon and ribavirin. On May 18, 2006, Dr. Nisi instructed Sparks to administer 150 micrograms/0.5 milliliters of interferon by injection once weekly and to administer 1200 milligrams of ribavirin daily. Dr. Nisi and Sparks also discussed follow up blood work and a follow up appointment within four weeks.

Sparks ordered the interferon kits and the ribavirin on May 18, 2006. The interferon was delivered to the Jail on May 22, 2006. Nurse Brown gave Jones his first interferon injection on May 22, 2006, at approximately 4 p.m.. He was given 1200 milligrams of ribavirin at 8 p.m. pill call.

On May 23, 2006, Brown received a call at approximately 12:30 a.m. from officer Baily on the night shift reporting that Jones was complaining of fever, headache, and chills. Baily was concerned that Jones was experiencing side effects from the interferon injections and ribavirin pills. Jones' temperature was reported as 102.7 degrees at that time. Brown instructed jail staff to give Jones 200 milligrams of ibuprofen and to follow up with another 200 milligrams in four hours if his temperature remained elevated. Jones was given the second 200 milligram dose of ibuprofen and his temperature fell to 98.1 degrees.

On May 23, 2006, Brown placed a call to Dr. Nisi's office to report the side effects associated with Jones' first interferon injection. She spoke with a nurse in Dr. Nisi's office. The nurse stated that Dr. Nisi was not surprised by Jones' elevated temperature, headache, and chills. She also indicated that Dr. Nisi recommended that Jones receive the interferon injection at bedtime to reduce the frequency of side effects and to help Jones sleep better. Brown also set a follow up appointment for Jones with Dr. Nisi. Based on Dr. Nisi's recommendation, Brown decided to administer all subsequent interferon injections at 8 p.m. Richwine and Williams were not aware of Brown's communications with Dr. Nisi's office concerning altering the time of Jones' injections and were not involved with the decision to change the time of the injections to 8 p.m.

On May 24, 2006, Jones complained of headaches and itching. Brown checked his temperature and found it to be normal at 98.6 degrees. Jones complained of an itching sensation on both of his arms. Brown examined Jones' arms and observed a non-defined rash without other involvement. Brown reported Jones' symptoms to nurse practitioner Sparks and she instructed Brown to tell Jones that they would give him 600 milligrams of ibuprofen per day for headaches and 10 milligrams of Zyrtec at bedtime for itching. Brown also instructed Jones to resubmit a medical request form as needed for further treatment and evaluation.

On Monday May 29, 2006, Brown attempted to give Jones another injection of interferon at approximately 8 p.m. He refused to take the injection. On May 30, 2006, Brown approached Jones again at 12:15 p.m. and asked if he would take the injection. She told Jones that she had already mixed the active ingredients of the interferon and that the shot would be wasted if it were not used. Jones agreed to take the injection at that time. On May 31, 2006, Brown completed a refusal of medical care form to document his May 29, 2006, refusal to take the interferon injection. Jones was angry and scribbled an indecipherable signature on the form in her presence. On Thursday June 8, 2006, Brown attempted to give Jones another injection of interferon at approximately 8 p.m. Jones refused to take the injection at 8 p.m. Jones stated that he knew that they were trying to keep him from seeing officer Marissa Edwards. He further stated that he was refusing the injection because it was against his religion of Satanism to "defile my body on Thursdays and Fridays." He went on to tell Brown that he would "keep on doing things." Jones' cell block was flooded later that night. Brown recorded these entries in Jones' medical progress notes on June 8, 2006.

Brown completed a refusal of medical care form to document his refusal to take the interferon injection. Jones signed the form in her presence. Jones' medical administration record indicates that he began receiving 1200 milligrams of ribavirin by mouth daily beginning on May 23, 2006, until his transfer to the Department of Correction on June 9, 2006.

The Jail has a designated law library area on the 4th floor. Inmates are permitted access to a computer terminal and a CD containing case law. The CD is published by the Indiana Public Defender's Counsel and is updated quarterly. The CD contains software permitting access to case law. The software allows the inmate to use a mouse to search material contained on the CD. The software is designed in such a way that does not permit user input through a keyboard.

Legal forms are available near the law library area and the commissary areas. Legal forms for both civil and criminal proceedings, including but not limited to, tort claim action, motion to dismiss, and sentence modification forms, are available to inmates.

Jones was permitted access to the law library on approximately 16 occasions between August 17, 2005, and January 17, 2006. Maximum security inmates are permitted access to the law library by submitting an inmate request slip. Each maximum security inmate must wait his turn but is permitted individual access to the computer terminal on the 4th floor of the Jail. The sessions typically last anywhere from 1 to 2 hours.

Jones requested to visit the law library on April 19, 2006. Williams responded to Jones' request on April 21, 2006, indicating that Jones was represented by counsel in his current criminal cases and that he had no other pending cases in which he was not appointed counsel. Williams denied Jones' request to visit the law library on that basis. Williams received no other requests from Jones to use the law library after April 19, 2006.

Pens, writing tablets, and postage are available for purchase through commissary. Commissary is offered to inmates twice each week. Jones had sufficient funds on his commissary account between April, 2006 and June, 2006 to purchase postage, pens, paper or other related items. Jones' commissary record indicates that he came into the Jail on August 17, 2005 with $117.52 on his commissary account. Inmates of any classification who are determined indigent can receive pens, paper and postage from the Jail. Indigent inmates are defined as those inmates without funds in their commissary account. Indigent inmates can request indigent kits which contain items such as pens, paper and writing tablets. Jones requested and received some indigent kits while incarcerated at the Jail.

### III. Discussion

*Denial of Access to GED Courses*

Jones alleges that he was denied the opportunity to finish work on his GED while at the Jail because he was classified as a maximum security inmate. The defendants first argue that Jones failed to exhaust his available administrative remedies as to this claim. The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust his available administrative remedies before bringing a suit concerning prison conditions under § 1983. 42 U.S.C. § 1997e(a); *Porter v. Nussle,* 534 U.S. 516, 524-25 (2002). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo,* 126 S. Ct. 2378, 2385 (2006) (footnote omitted); *see also Dale v. Lappin,* 376 F.3d 652, 655 (7th Cir. 2004) ("In order to properly exhaust, a prisoner must submit inmate complaints and appeals 'in the place, and at the time, the prison's administrative rules require.'")(quoting *Pozo [v. McCaughtry,* 286 F.3d 1022, 1025 (7th Cir. 2002]). Strict compliance is required with respect to exhaustion, and a prisoner must properly follow the prescribed administrative procedures in order to exhaust his remedies. *See Dole v. Chandler,* 438 F.3d 804, 809 (7th Cir. 2006). Jones asserts that he filed grievances relating to all of his claims. The court finds that a genuine issue of fact exists as to the issue of exhaustion.

The defendants further argue, however, that Jones is not entitled to attend any GED program while confined at the Jail. It is on the merits of this claim that the defendants are entitled to summary judgment. *See Sandin v. Conner,* 515 U.S. 472, 484 (1995) (due process protections "will be generally limited to freedom from restraint which, . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."); *Higgason v. Farley*, 83 F.3d 807, 809-810 (7th Cir. 1996) (the denial of access to educational programs does not infringe on a protected liberty interest, even if denied the opportunity to earn good time credits); *Garza v. Miller,* 688 F.2d 480, 485-86 (7th Cir. 1982) (there is no constitutional mandate that prisons must provide educational, rehabilitative, or vocational programs). Accordingly, the defendants are entitled to summary judgment as to Jones' claim that he was entitled to work on his GED while at the Jail.

*Denial of Recreation*

Jones alleges that as a pretrial detainee, he was entitled to outdoor recreation during his stay at the Jail. Jones cites no authority in support of this proposition, nor could he because that is not the law.[2] Under any standard, the evidence demonstrates that Jones had adequate access to indoor recreation. Jones did daily exercises in his cell and in the dayroom, sometimes using a mop bucket with which to workout.

Furthermore, the defendants argue that they are entitled to summary judgment on this claim because Jones has failed to allege or prove any physical injury resulting from the lack of recreation. Absent an allegation of physical injury, Jones' claim fails to state a claim upon which relief can be granted. 42 U.S.C. § 1997e(e). "The conditions of imprisonment, whether of pretrial detainees or of convicted criminals, do not reach even the threshold of constitutional concern until a showing is made of 'genuine privations and hardship over an extended period of time.'" *Duran v. Elrod,* 760 F.2d 756, 759 (7th Cir. 1985) (quoting *Bell v. Wolfish*, 441 U.S. 520, 542 (1979)). For these reasons, the defendants are entitled to summary judgment as to the denial of recreation claim.

*Religion*

Jones alleges that he was denied his right to exercise religious freedom, in violation of the First Amendment, because he was denied permission to attend group church services. As a maximum security inmate at the Jail, Jones was not allowed to attend group church services, but he was permitted to meet individually with a volunteer chaplain or minister. Jones met a number of times with a minister while at the Jail. Jones prayed with the minister and talked about things in the Bible.

It is not disputed that, while at the Jail, Jones had a limited right to freely exercise his religious beliefs. "[A] prisoner is entitled to practice his religion insofar as doing so does not unduly burden the administration of the prison. But, conversely, a prison is entitled to enforce its regulations, even if they crimp a prisoner's religious style, if the regulations are reasonably related to legitimate penological objectives." *Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990) (internal citation and quotation omitted). "A prisoner's right to freely exercise his religious beliefs does not depend upon his ability to pursue each and every aspect of the practice of his religion." *Canedy v. Boardman*, 91 F.3d 30, 33 (7th Cir. 1996). "A prison may restrict a prisoner's ability to adhere absolutely to a particular tenet of his religion, and if the prison has sound penological interests supporting the restriction and, if those interests outweigh the prisoner's religious interests, the restriction does not violate the First Amendment." *Id.*

---

[2]The defendants assert that Jones was a convicted felon at the time of his stay at the Jail. The record shows, however, that Jones was brought to the Jail because he had been charged with battery and a parole violation for failing to report to his parole officer. The fact that Jones had been a convicted felon at an earlier time, prior to his release on parole, does not change the fact that he was brought to the Jail on pending charges. The court shall treat Jones' claims as those asserted by a pretrial detainee.

7

The restriction on maximum security inmates from attending group religious services is imposed by Jail policy for purposes of institutional safety and security. The Jail limits the movement of maximum security inmates because such inmates have been charged with serious felonies and have had a significant disciplinary history within the Jail.

The restriction on group religious services for maximum security inmates is reasonably related to legitimate penological objectives, those of safety and security of the Jail. In addition, Jones was not prevented from pursuing any particular aspect of his religion. He was, in fact, allowed to meet with ministers at the Jail. "De minimus burdens on the free exercise of religion are not of constitutional dimension." *Rapier v. Harris*, 172 F.3d 999, 1006 n.4 (7th Cir. 1999). For these reasons, the defendants are entitled to summary judgment as to this claim.

*Deliberate Indifference to Serious Medical Needs*

Jones alleges that Williams requested that Jones be transferred to a Department of Correction facility because of the cost of his hepatitis C treatment. Jones further alleges that on occasion starting in late May 2006, the Jail failed to provide him with interferon shots once a week and three ribavarin capsules twice a day, all as prescribed by gastroenterologist Dr. Nisi.[3]

On January 12, 2006, a Dr. Nisi ordered that Jones begin weekly interferon shots and daily ribavarin therapy for hepatitis C for a period of six months. It is undisputed that on January 20, 2006, Jones was transferred from the Jail to the Department of Correction and that his medical packet followed him to prison. It is also undisputed that Dr. Nisi's treatment plan was not followed while Jones was confined at the prison. Any lack of treatment at the prison, however, cannot be attributed to the fact that Jones was transferred to the prison by the Jail.

After Jones returned to the Jail in April 2006, he saw Dr. Nisi on May 5, 2006, Dr. Nisi's first available appointment. Dr. Nisi ordered that the weekly interferon and daily ribavarin therapy resume after the required blood work was completed. On May 12, 2006, nurse Sparks received Jones' lab results, and on May 18, 2006, Sparks discussed the results with Dr. Nisi's office. The dosages for the weekly interferon and daily ribavarin were determined and the prescriptions were ordered. The medications were delivered to the Jail on Monday May 22, 2006, and Jones received his first interferon injection that day. Jones refused a subsequent injection on May 29, but agreed to take it on Tuesday May 30, 2006. He had refused because he did not want to take the injection at night. Jones refused to

---

[3]The defendants argue that prior to filing this lawsuit Jones did not file a grievance relating to the timing of interferon shots, but the record shows that Jones did file grievances related to medical needs and hepatitis treatments prior to the date the denial of medical treatment claim was added to the lawsuit on June 19, 2006. There is a genuine issue of fact as to whether Jones exhausted his available administrative remedies as to the interferon injections claim, and therefore, defendants are not entitled to summary judgment on the issue of exhaustion as to this claim.

take his injection the following week on a Thursday because he wanted to take it on the same day each week. He further stated that it was against his religion of Satanism to defile his body on Thursdays and Fridays. Jones alleges that Jail staff changed the timing of his interferon shots so that Jones would not have contact with a particular Jail female officer to whom he had written a letter. Jones was transferred to the Indiana Department of Correction on June 9, 2006.

"To recover damages under [42 U.S.C.] § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." *Gentry v. Duckworth,* 65 F.3d 555, 561 (7th Cir. 1995). Here the undisputed facts show that neither Richwine nor Williams had any responsibility for, nor took any actions related to, Jones' treatment for hepatitis C. There is no evidence supporting Jones' allegation that Williams had issued orders prohibiting Jones from being in an area of the Jail during the time a particular female staff member was present in an effort to prevent Jones from receiving his injections. Rather, as far as the timing of the weekly injections is concerned, Dr. Nisi recommended that to reduce the frequency of side effects from the injections, they should be administered at bedtime. The staff of the Jail were entitled to rely on the medical judgment of Dr. Nisi in determining whether and what medical care should be provided to Jones. *Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995); *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990) (supervisory prison officials are entitled to rely on professional judgment of trained medical personnel). There is no evidence that any Jail staff, including the defendants, were deliberately indifferent to a serious medical need by intentionally interfering with Jones' medical treatment as ordered by Dr. Nisi.

A court examines the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs. *Reed v. McBride,* 178 F.3d 849, 855 (7th Cir. 1999). That examination shows in this case that Jones did not suffer medical mistreatment or a denial of medical care while he was confined at the Jail. During the short period of time relevant to this claim, the Jail medical staff complied with the prescribed course of treatment and responded to complaints of side effects, and neither defendant interfered with Jones' medical treatment. The evidentiary record negates the presence of the subjective state of mind required to show deliberate indifference, *i.e.,* that the defendants were "subjectively aware of [Jones'] serious medical needs and disregarded an excessive risk that a lack of treatment posed to his health or safety." *Wynn v. Southward,* 251 F.3d 588, 593 (7th Cir. 2001). The defendants are entitled to summary judgment as to the denial of medical treatment claim.

*Denial of Access to the Courts*

In *Lewis v. Casey,* 518 U.S. 343, 351-57 (1996), the Supreme Court explained that an inmate alleging denial of access to the courts lacks even the standing to assert such a claim in the absence of actual injury, which means an adverse decision in, or inability to litigate, some concrete legal claim. Jones alleges that his access to the courts was denied in two cases: (1) a state court proceeding in which he appealed a restraining order that had been issued against him; and (2) this case. Jones was not confined at the Jail from January 20, 2006, through April 7, 2006.

9

In the state court case, a notice of completion of transcript was sent to Jones at the Jail on January 26, 2006. He reported to the court his change of address on February 7, 2006, but the notice of completion of transcript was apparently not re-sent to him. On March 28, 2006, the court of appeals dismissed his appeal. Jones alleges that the forwarded mail did not reach him until after the case was dismissed. The consequences of Jones' transfers to different institutions do not constitute the denial of access to the courts. Moreover, a restraining order claim is not constitutionally protected in relation to allowing access to the courts. *Lewis*, 518 U.S. at 355 (inmates are to be provided tools needed to attack their sentences or challenge the conditions of their confinement - - any impairment of litigating other types of cases "is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.").

By virtue of this lawsuit having been timely filed, it is clear that Jones' access to the courts was not impeded by the defendants. There has been no motion or order to which Jones has not responded. He has also filed numerous motions and notices on his own behalf. His contention that he had to do a "fast sloppy job of amending his complaint" in June 2006 is meritless. The court granted his motion to amend on June 19, 2006, and added two claims pursuant to that motion. Jones has not shown any inability to litigate this case.

Jones has presented no evidence showing that he has been prevented from filing or proceeding with any other litigation. He admits to having received two stamped envelopes each week which he could use for legal mail. The defendants are entitled to summary judgment as to Jones' denial of access claim.

### IV.  Conclusion

Jones has not shown that a genuine issue exists for trial as to his claims against the defendants. For the reasons discussed in this Entry, the defendants are entitled to judgment as a matter of law. Accordingly, the motion for summary judgment filed by the defendants on January 30, 2007, and supplemented on March 23, 2007, is **granted.**  All claims have now been resolved in this case.  Judgment consistent with this Entry and with the Entry issued on April 26, 2006, shall now issue.

**IT IS SO ORDERED.**

Date: 06/18/2007

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana